GARB *v.* GARB.

1. DIVORCE—EXTREME CRUELTY—VISITS TO AGED PARENTS—EVIDENCE.

No importance is attached to wife's claim of neglect because of husband's twice-a-day visits to aged parents during their few remaining months of their life immediately after his marriage to plaintiff, as basis for extreme cruelty in wife's suit for divorce, where defendant administered insulin to his diabetic father almost every morning.

2. SAME—FAULT ON PART OF BOTH PARTIES.

It is the policy of this State to refuse a divorce to parties where both are at fault.

3. SAME—EXTREME CRUELTY—RECORD.

Decree denying either wife or husband a divorce on ground of extreme cruelty is affirmed under record showing that both parties are partly to blame for an unhappy marriage, and because of absence from home of elder child who has been institutionalized because of mental and physical retardation and because defendant's child by previous marriage will probably be more reasonable and easier to take care of, the home would be more peaceful.

---

REFERENCES FOR POINTS IN HEADNOTES

[1-3] 17 Am Jur, Divorce and Separation, § 48 *et seq.*
[4] 14 Am Jur, Costs, § 92; 17 Am Jur, Divorce and Separation, §§ 580, 581.

4. SAME—COSTS.

> No costs are allowed either party to suit for divorce upon affirmance of decree dismissing bill and cross bill for divorce from which each appealed.

Appeal from Berrien; Arch (Charles O.), J., presiding. Submitted June 15, 1950. (Docket No. 83, Calendar No. 44,661.) Decided September 11, 1950.

Bill by Florence R. Garb against William M. Garb for divorce on ground of extreme and repeated cruelty. Cross bill by defendant against plaintiff for divorce on ground of extreme and repeated cruelty. Decree dismissing bill and cross bill. Both parties appeal. Affirmed.

*Robert P. Small,* for plaintiff.

*Charles W. Gore,* for defendant.

BUTZEL, J. Florence R. Garb, plaintiff and cross-appellee, brought suit for divorce against William M. Garb, defendant and cross-appellant, who filed a cross bill. On July 7, 1943, the date of the marriage she was 27 years of age; she had a college education, had experience as a truant officer and child welfare agent, and evidently was a woman of culture. He was a widower about 12 years older than plaintiff and had a son Elliott almost $3\frac{1}{2}$ years of age by his previous marriage. Defendant's first wife died when Elliott was 7 months old. Plaintiff prepared for matrimony by reading books. Defendant's aged parents were living at the time he remarried. Defendant had been afflicted with tuberculosis in his younger years and as a result some ribs were removed and a lung collapsed. He recovered to such an extent that later on he was able to pass a life insurance examination. However, he was not too

robust and was ordered to take it easy. He claims it was necessary to rest in bed until later in the morning, return to his home for a rest after lunch, and retire early in the evening. He had an attack of pneumonia some time after his recovery from tuberculosis. Plaintiff claims that it was unnecessary for defendant to observe these long rest periods, and it resulted in his remaining at home for longer periods and there was much friction. We attach no importance to plaintiff's claim in that regard.

Defendant went to his parents' home almost every afternoon and then again in the evening, and also in the morning when he administered insulin to his father, a diabetic. Plaintiff frequently accompanied defendant but after she became pregnant she did not go as often. She, however, resented being thus neglected almost every evening so shortly after their marriage. When she did accompany him the parents frequently spoke in a foreign language, which she did not understand. Defendant's father died only about 4 months after the parties were married and the mother died 5 months after the father. We again attach no importance to this claim of neglect.

Undoubtedly the cause of much of the difficulty arose over plaintiff's allegedly improper treatment of Elliott. She claims that she treated him affectionately and tried to train him; that at times he became unruly and frequently he flew into tantrums. Instead of receiving defendant's assistance, he upbraided her and often sided with the child so that defendant made it very difficult for her to bring up Elliott properly. As an instance it was shown that defendant had forbidden that lights be turned on in the morning at breakfast time. Elliott reported to defendant that plaintiff had turned on the lights and defendant thereupon berated her. Another time Elliott called defendant by telephone at his place of busi-

ness to complain of plaintiff. Plaintiff claims that defendant constantly scolded her and treated her in a scornful manner, even when she was pregnant and not feeling well. On the other hand, testimony indicates that defendant was not too successful in handling the child and on one occasion whipped him with a belt. He denies this but plaintiff's testimony is corroborated by a professional nurse who was in the house at the time. Former servants testified on behalf of defendant but their testimony was so weakened on cross-examination that but little importance may be attached to it.

Shortly after plaintiff married she became pregnant and on June 19, 1944, Harry was born. It was necessary to perform a Caesarean operation. There was no end of difficulties with Harry, who not only was spastic but very slow in comprehension and movement. A feeding problem arose and it took plaintiff an hour each time in an attempt to feed him. It was a long time before he was even able to stand and when he did so, Elliott pushed him at times, and caused him to fall. All this further added to the difficulties. Shortly after Harry's birth plaintiff again became pregnant and Joel was born on July 9, 1945, when again a Caesarean operation was necessary. These operations and experiences left plaintiff weak and unhappy. She claims that quarreling and faultfinding by defendant began 3 or 4 months after their marriage and increased in tempo as time went on, that defendant kept carping, became overcritical, and just made it more difficult for her to get along with him; that he was uncommunicative, abusive and mentally cruel towards her. She claims that when they were out in public, he put on company manners but when they returned home, he resumed his faultfinding and abuse and showed actually no affection for her. On the other hand, defendant claims that plaintiff was entirely at fault, that

she did the quarreling, et cetera; that she did not treat Elliott properly. One of his main complaints is that after the second child was born she refused to cohabit with him. He admits that she told him that it had become very painful. She testified that her refusal was due to physical as well as mental pain, and also the fact that he showed absolutely no affection for her prior to the attempt to cohabit. She also testified that she realized the difficulties and that she even suggested they seek medical help. This was done, but evidently to no avail. She further claims that she was very careful in her expenditures and made a few larger ones for the house but wholly with his consent. However, when he saw the bills he became abusive.

There is no question but that the home was a very unhappy one. Defendant finally left it, taking Elliott with him, while Joel remained with plaintiff. The record is quite convincing that plaintiff was not too well, and that the 2 Caesarean operations, together with constant quarreling and her grief and anxiety because of a spastic and almost feeble-minded child had its effect on her. She needed affection, not abuse.

The case differs from any we have had under consideration. There is not the charge of the slightest sexual immorality by either of the parties. They seem persons of refinement and capable of good judgment. They do agree that they have a duty in common toward Harry, who is being cared for in a very expensive institution in Philadelphia where he receives special care and treatment in order to overcome at least part of his serious deficiencies. It is improbable that he will ever be able to do any work that requires physical or mental strength. The cost of his maintenance and education, including the expense of an occasional visit to him, amounts to over $5,000 a year. Plaintiff charges that instead of re-

ceiving the assistance and encouragement she was entitled to from defendant she suffered mental cruelty and abuse from him. Defendant, on the other hand, claims that she made the home a very unhappy one, and recites incidents, which we shall not detail but which indicate that she was also at least partly to blame. The stressing of plaintiff's charges of defendant's neglect in visiting his aged parents during the few remaining months of their lifetime following the marriage and of defendant's taking the long rest hours that he felt he needed did not strengthen her case.

Defendant is a man of some means. He owns a number of parcels of real estate as well as an old established business, all of which he received from his parents. He has enjoyed a very comfortable income. He appeared to be fair on the witness stand and testified that he was willing to make proper provisions so that Harry would receive the necessary education and training, and also to see that Mrs. Garb and Joel were properly supported equally with himself, in keeping with his station and estate. Notwithstanding this fact, his attorney, in the brief filed for him, asked that plaintiff move to a smaller house which should be awarded to her in full for her share in the division of the property and then be paid only $100 a month for the care of Joel but no alimony for herself. The judge, however, in view of his decision found it unnecessary to decide questions of alimony and division of property. He felt that the parties had not made an exhaustive effort to make the marriage a success, and that a divorce should not be granted, as each was guilty of cruelty towards the other.

It has long been the policy of this State to refuse divorce where both parties are at fault. *Hoff* v. *Hoff*, 48 Mich 281; *Winters* v. *Winters*, 255 Mich 672; *Trombley* v. *Trombley*, 313 Mich 80; *Kuhfal* v. *Kuh-*

*fal,* 318 Mich 105; *Kanka* v. *Kanka,* 318 Mich 109. In the last analysis we cannot help but feel that both parties are partly to blame and that it is a situation that can be worked out by the parties who have the education, refinement and ability to adjust their difficulties. There is no question but that the fact that the condition and demands of the child Harry, who is retarded both mentally and physically, added much to plaintiff's unhappiness and discomfort as well as that of defendant. Harry will be in an institution for a long time, and while the parents will continue to have grief and anxiety on his account, the home will be much more peaceful. Elliott is now older and undoubtedly more reasonable and easier to take care of. Under the circumstances of this case and the law applicable thereto, a home should not be broken up and thus deprive young children of the joint help and care of both parents.

We are in accord with the decree of the lower court dismissing the bill and cross bill. It is affirmed, but without costs to either party.

BOYLES, C. J., and REID, NORTH, DETHMERS, CARR, BUSHNELL, and SHARPE, JJ., concurred.